# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **XCOAL ENERGY & RESOURCES, LP,** | ) |
| | ) |
| Plaintiff, | ) Case No. 2:07CV00057 |
| | ) |
| v. | ) **OPINION AND ORDER** |
| | ) |
| **LANDON KELLER SMITH, ET AL.,** | ) By: James P. Jones |
| | ) Chief United States District Judge |
| Defendants. | ) |

*R. Johan Conrod, Jr., and Hunter W. Sims, Jr., Kaufman & Canoles, P.C., Norfolk, Virginia, for Plaintiff; Steven R. Minor, Elliott Lawson & Minor, PC, Bristol, Virginia, and Elsey A. Harris, III, Mullins Harris & Jessee, Norton, Virginia, for Defendants.*

In this civil action alleging fraud in a coal sales transction, the defendants have moved for summary judgment in their favor. After careful consideration of the record and the contentions of the parties, I will grant the motion in part and deny it in part. In summary, I hold that there are genuine issues of material fact that require the case to go to trial as to both defendants.

I

In this diversity case, the plaintiff, Xcoal Energy & Resources, L.P. ("Xcoal"), claims that the defendants, Landon Keller Smith and Karl Louis Singer, principals in a coal mining business, made false representations regarding the purchase of coal by

Xcoal from one of the defendants' owned entities, Glamorgan Coal Resources, LLC ("Glamorgan"). Xcoal alleges that it agreed to pre-purchase coal from Glamorgan in separate transactions on July 29, 2005, September 28, 2005, October 19, 2005, and November 1, 2005. Xcoal paid Glamorgan in advance for this coal in the total amount of $2,984,430. The coal was never delivered, and on May 10, 2006, Glamorgan filed for bankruptcy. In the bankruptcy proceeding, Xcoal learned that the coal purchased had never been in Glamorgan's inventory, contrary to the alleged representations of the defendants Smith and Singer.[1]

The defendants have filed a Motion for Summary Judgment, which has been briefed and argued and is ripe for decision.[2]

---

[1] This court earlier considered the sufficiency of the allegations of fraud under Federal Rule of Civil Procedure 9(a), but eventually held that the plaintiff's Second Amended Complaint adequately stated a cause of action. *See Xcoal Energy & Res., L.P. v. Smith*, No. 2:07CV00057, 2008 WL 312912 (W.D. Va. Feb. 4, 2008); *Xcoal Energy & Res., LP v. Smith*, No. 2:07CV00057, 2008 WL 746989 (W.D. Va. Mar. 20, 2008); *Xcoal Energy & Res., LP v. Smith*, No. 2:07CV00057 (W.D. Va. May 16, 2008). For ease of reference, the Second Amended Complaint will be referred to as the "Complaint."

[2] The court denied by oral bench opinion a prior request by the defendants for summary judgment. In that motion, the defendants asserted that the present claims had been settled in Glamorgan's bankruptcy proceedings. I held that there were genuine issues of material fact as to the scope of any settlement.

II

The summary judgment record, viewed in the light most favorable to the nonmovant, shows the following facts.

Defendants Smith and Singer, longtime friends and business associates, were the members and officers of Unity Virginia Holdings, LLC, which in turn owned Glamorgan and its sister entities. Together, the Glamorgan entities composed a unified coal mining business located in Wise, Virginia, in this judicial district. Smith and Singer purchased the Glamorgan entities out of bankruptcy in February of 2005. Singer invested substantial capital, and Smith invested "sweat equity" in the project. They worked out of their office in Dallas, Texas, and they hired people locally to run the day-to-day coal mining operations. In March and April of 2005, they met with Ernie Thrasher, president of plaintiff Xcoal, which markets and brokers coal domestically and internationally. They decided to use Xcoal to market coal produced by Glamorgan.

Smith's and Singer's new enterprise had financial difficulties from the start. The business plan relied on the company's ability to mine metallurgical coal, which is used by steel mills to produce coke and was sold at the time for approximately $85 per ton. Unfortunately, the quality of the coal produced rarely met all of the requirements of metallurgical coal used by domestic steel mills. Most of the coal was

steam coal, which could be burned to produce electricity and sold for $65 per ton. Xcoal purchased both steam coal and metallurgical coal from Glamorgan for its customers. Although most of the metallurgical coal was not a high enough quality to be shipped directly to domestic steel mills, Xcoal was able to mix Glamorgan's metallurgical coal with other coal owned by Xcoal and stored in Baltimore, Maryland, with the resulting product shipped internationally.

Singer convinced Xcoal to prepay for coal in order to help alleviate cash flow problems that Glamorgan was facing. "Singer represented that the coal existed in the Glamorgan . . . stockpile, but requested that [Xcoal] pre-purchase the coal before it had located a willing buyer ready to accept the shipment." (Compl. ¶ 16.) Xcoal agreed to do so, and issued a July 29, 2005, Purchase Order, which contained the following language:

> Title to the coal shall transfer to BUYER [Xcoal] upon payment to Glamorgan, regardless of the location of the coal. SELLER [Glamorgan] warrants that it is holding the coal, free of any encumbrances, liens, etc., in inventory at the rail loading facility and will release the coal upon the written instructions from Xcoal Energy & Resources.

(Compl. ¶ 19 & Ex. A). The term "FOB mine" was also included on the Purchase Order and the Invoice. (Compl. Ex. A, B.) The Complaint alleges,

> Defendant Singer stated that [Glamorgan] would always have at its facility at any given time, an amount of coal on hand equal to the

-4-

quantity [Xcoal] had purchased. Further, Defendant Singer added that whenever [Xcoal] requested that the coal be delivered to a third party purchaser, that instruction would be followed. These statements were untrue when made.

(Compl. ¶ 20.) Xcoal relied on these assertions and prepaid $617,500 for 10,000 tons of steam coal pursuant to the July 29, 2005, Purchase Order. Relying on similar assertions made by Singer later, Xcoal agreed to prepay for an additional 30,000 tons of metallurgical coal, under the same terms, in three increments of 10,000 tons each on September 28, 2005, October 19, 2005, and November 1, 2005. After these four transactions, Xcoal had prepaid a total of $2,984,430.

Singer hoped that Xcoal would form a strategic partnership with Glamorgan. On several occasions from 2005 to 2006, Singer and Thrasher discussed this possibility. At some point, Singer suggested converting Xcoal's prepayments into equity in Glamorgan. Thrasher eventually declined this request.

Throughout this time period, when Xcoal found customers interested in purchasing Glamorgan coal, Xcoal would pay for shipments of coal and did not demand the coal for which it had already prepaid. In late December 2005, Xcoal expressed its desire to use some of the prepaid coal for one of its new customers, Algoma. But Singer "asserted that the Glamorgan entities needed to book additional coal sales to bolster their upcoming presentation to potential lenders and investors."

(Compl. ¶ 40.) Singer told Thrasher that Glamorgan had coal in its inventory equal to the amount Xcoal had previously purchased, and that Glamorgan would mine separate coal for the Algoma sale. Xcoal agreed to purchase separate coal only if Glamorgan would furnish warehouse receipts acknowledging that Glamorgan was holding Xcoal's prepaid coal in its inventory. Xcoal specifically agreed not to exercise its rights regarding the prepaid coal, including the right to demand immediate delivery of the coal, in exchange for such warehouse receipts. On December 27, 2005, Smith executed two written Warehouse Receipts stating that Glamorgan was storing coal for Xcoal. Smith admitted during his deposition that he knew the Warehouse Receipts were false when he signed them.

The Glamorgan entities filed for bankruptcy on May 10, 2006. Xcoal attempted to compel Glamorgan to turn over the coal for which it had prepaid and believed to be in Glamorgan's inventory. However, Singer filed a declaration in bankruptcy court stating that there was no such coal and essentially admitting that the Warehouse Receipts were false. As a result, Xcoal had no claim to title of any Glamorgan coal, and it did not receive anything for the money that it had previously prepaid.[3] This lawsuit followed.

---

[3] Xcoal received some shipments of coal in 2006 that may have been intended to offset that which had been prepaid. Because the exchange occurred within ninety days of Glamorgan's bankruptcy, however, it was claimed that bankruptcy law did not permit the

-6-

Case 2:07-cv-00057-JPJ-PMS   Document 101   Filed 07/07/09   Page 6 of 14   Pageid#: 1124

III

Count One of the Complaint alleges that Singer made false statements, and that Xcoal relied on those statements in making each of the four prepayments for coal. (Compl. ¶¶ 13-30, 71.) The Complaint further alleges that Smith signed and Singer authorized the false Warehouse Receipts, and that Xcoal relied on the receipts and contemporaneous false statements in agreeing to forego its right to the prepaid coal and in paying separately for the Algoma coal. (Compl. ¶¶ 41-57, 71.) The Complaint contends,

> Because it did not know the truth, [Xcoal] refrained from the following:
>
> a) making a demand for delivery of its Coal;
>
> b) commencing a civil action to recover the Prepayments;
>
> c) initiating an action in detinue to recover the Coal to the extent it existed;
>
> d) seeking an injunction to prohibit the distribution of the Coal to another party; and
>
> e) demanding the appointment of a receiver to manage the Glamorgan entities.

---

offset and that Xcoal was required to pay separately for that shipment. Xcoal settled this claim for $120,000. The defendants contend that the settlement also encompassed the plaintiff's current claims. As I ruled earlier, there remain genuine issues of material fact regarding the scope of the settlement. *See supra* note 2.

-7-

(Compl. ¶ 77.) "Had [Xcoal] pursued one or more of these rights, upon information and belief, [Xcoal] would have recovered more than it would have recovered through the subsequent bankruptcy of the Glamorgan entities." (Compl. ¶ 78.)

The Complaint includes Count Two "[a]s an alternative to Count [One]." (Compl. ¶ 82.) Count Two alleges that if Glamorgan did have Xcoal's pre-purchased coal in inventory, the defendants committed fraud by selling the same coal to Xcoal for the Algoma sale. As a result, the Complaint alleges that Xcoal suffered $705,044.46 in damages, the amount paid for the Algoma coal.

Summary judgment is appropriate when there is "no genuine issue as to any material fact," given the parties' burdens of proof at trial. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether the moving party has shown that there is no genuine issue of material fact, a court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *See Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985), *abrogated on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228, 238 n.2 (1989).

The defendants contend that the Complaint does not adequately allege that any misrepresentations were made prior to Xcoal's prepayments, and that Xcoal is therefore limited in Count One to the claim based on its subsequent reliance on the

Warehouse Receipts. However, I find that the allegations in the Complaint are sufficient for Xcoal to proceed on its theory of liability based on earlier misrepresentations. (*See* Compl. ¶¶ 20-21, 24, 26, 71.) The defendants concede that there are genuine issues of material fact for the jury regarding this claim, such as whether the alleged misrepresentations occurred and whether Xcoal reasonably relied upon them.

The defendants also claim that they cannot be liable under Count One because the misrepresentations contained in the Warehouse Receipts were not made until after Xcoal's four prepayments. The Complaint alleges that Xcoal relied upon the Warehouse Receipts and contemporaneous false statements in forgoing its rights to demand the prepaid coal and to seek other remedies. I agree with the defendants that the evidence regarding the claim based solely on the Warehouse Receipts fails as a matter of law because any damages flowing from such reliance are speculative.[4]

A plaintiff claiming fraud must show "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *State*

---

[4] The defendants also argue that Xcoal did not rely or could not have reasonably relied upon the Warehouse Receipts. Because I find that any cause of action based solely on the Warehouse Receipts fails because the jury would have to speculate as to any damages suffered by Xcoal, I need not address the defendants' arguments regarding reliance.

-9-

Case 2:07-cv-00057-JPJ-PMS   Document 101   Filed 07/07/09   Page 9 of 14   Pageid#: 1127

*Farm Mut. Auto. Ins. Co. v. Remley*, 618 S.E.2d 316, 321 (Va. 2005) (quotation marks and citation omitted). "A plaintiff is not required to prove the exact amount of his damages; however, he is required to show sufficient facts and circumstances to permit a jury to make a reasonable estimate of those damages." *Murray v. Hadid*, 385 S.E.2d 898, 904 (Va. 1989) (upholding trial court ruling setting aside damage award in fraud case where claimed damages were too speculative).

Xcoal claims but for the defendants' misrepresentations, Xcoal would have demanded the coal for which it had already paid and commenced legal proceedings if Glamorgan failed to comply. However, the value of such lost opportunity is speculative at best. There is no evidence that Glamorgan would have turned over any coal for which Xcoal had prepaid if Xcoal had demanded shipment. There is nothing to show that Xcoal would have been able to collect on a judgment against Glamorgan if it had earlier pursued its legal remedies.

Xcoal insists that but for the Warehouse Receipts received on December 27, 2005, it would not have agreed to pay $705,044.46 for the Algoma coal. Instead, it would have demanded the coal for which it had already paid. Thus, Xcoal would have earned the same amount of proceeds from selling Glamorgan coal to Algoma, but without incurring the additional cost. Essentially Xcoal equates the value of its foregone opportunity to assert its right to shipment of prepaid coal with the amount

-10-

Case 2:07-cv-00057-JPJ-PMS   Document 101   Filed 07/07/09   Page 10 of 14   Pageid#: 1128

it paid for the Algoma coal. The defendants counter, "If XCoal had declined to pay for the Algoma coal, it would [have] gotten no coal to ship to Algoma and made no commission, if XCoal's theory is to be believe[d], that the Glamorgan company refused to deliver the coal without payment." (Reply Mem. in Supp. of Mot. for Summ. J. 8.) Again, whether and how much Xcoal would have recovered if it had attempted to assert its rights to the prepaid coal is entirely speculative on this record.

Although the Warehouse Receipts claim was sufficient to survive a motion to dismiss, the evidence in the record fails to establish a genuine issue of material fact for the jury. Therefore, Xcoal may not seek damages at trial based solely on its alleged reliance on the Warehouse Receipts and the contemporaneous false statements.

The defendants contend that because Smith's only alleged misrepresentations were contained in the Warehouse Receipts, and the Warehouse Receipts claim is inadequate on its own, the claim against Smith must fail. But Smith may still be liable for participating in the alleged fraud leading up to and inducing Xcoal's prepayments. "Under Virginia law, an officer or director of a corporation is liable only for those intentional torts he or she commits or authorizes on behalf of the corporation. . . . [P]laintiff must establish that defendant participated in, ratified, or otherwise authorized the [tort]." *Airlines Reporting Corp. v. Pishvaian*, 155 F. Supp.

2d 659, 666 (E.D. Va. 2001); *see also Andrews v. Ring*, 585 S.E.2d 780, 787 (Va. 2003) (describing liability of those "who participate" in the corporation's wrongful acts).

Here, Thrasher admits that Smith did not make any statements to him about the inventory of coal prior to the prepayments. However, Xcoal contends that Smith participated in Singer's ongoing fraud, which allegedly commenced prior to any prepayment. The evidence in this regard is admittedly circumstantial. Xcoal points to the following evidence: Smith and Singer worked together closely; Smith was the "sweat equity" partner and was intimately involved with running Glamorgan; Smith spoke to the CEO of Glamorgan on a daily basis and was likely familiar with the company's inventory; invoices for the four prepayments were sent to Smith; and one of the invoices specifically states that the payment from Xcoal was a "Funds Transfer for Advance against coal in inventory at mine." (Compl. Ex. C, at 8). In addition, Smith admits that he knew the Warehouse Receipts that he signed in December 2005 were false—that he was aware that there was no coal being held in inventory for Xcoal.[5] Although the false Warehouse Receipts cannot support a fraud claim on their

---

[5] The defendants contend that Glamorgan agreed to fill out the false Warehouse Receipts as an accommodation to Xcoal, which wanted the receipts for its own accounting purposes before the year ended. Xcoal argues, to the contrary, that it asked for the receipts as an assurance that Glamorgan was actually storing its coal in its inventory. This factual dispute is properly reserved for the jury.

-12-

own, they are relevant evidence that Smith may have participated in the ongoing fraud also alleged in Count One.[6] The evidence in the record regarding Smith's alleged knowledge and participation in the fraud is sufficient to survive the defendants' Motion for Summary Judgment.

As an alternative to Count One, Xcoal claims in Count Two that if the defendants were in fact keeping coal for Xcoal in inventory, and if the defendants did not mine separate coal for the Algoma sale, then the defendants committed fraud by selling the same coal to Xcoal twice. The defendants move for summary judgment on this count, arguing that Xcoal was not harmed by the Algoma sale; it received the coal for which it paid, and it earned a profit by selling that coal to Algoma. However, the defendants fail to appreciate that under this alternative theory of liability, Xcoal alleges that it was paying for coal for which it was already the rightful owner.

Since the defendants have both stated that they were not keeping coal in inventory for Xcoal, it is likely that Count Two will fail at trial. However, the defendants have not moved for summary judgment on that basis, so I find that it would be premature to grant summary judgment as to Count Two.

---

[6] Similarly, evidence of any false statements made by Smith or Singer after the prepayments were made may be admissible as to the surviving claim in Count One as evidence of their fraudulent intent.

-13-

IV

For the foregoing reasons, it is hereby **ORDERED** as follows:

1. The defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part;

2. As to the plaintiff's claim in Count One based on alleged fraud occurring prior to and throughout the time period the plaintiff made prepayments for coal, the defendants' motion is DENIED;

3. As to the plaintiff's claim in Count One based solely on reliance on the Warehouse Receipts and contemporaneous false statements, the defendants' motion is GRANTED; and

4. Count Two and the remaining claim in Count One will proceed to trial against defendants Singer and Smith.

ENTER: July 7, 2009

/s/ JAMES P. JONES
Chief United States District Judge