# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **XCOAL ENERGY & RESOURCES LP,** | )<br>)<br>) Case No. 2:07CV00057 |
| Plaintiff, | )<br>) |
| | ) **OPINION AND ORDER** |
| v. | )<br>) By: James P. Jones |
| **LANDON KELLER SMITH, ET AL.,** | ) Chief United States District Judge |
| | ) |
| Defendants. | ) |

*Hunter E. Sims, Jr., and R. Johan Conrod, Jr., Kaufman & Canoles, P.C., Norfolk, Virginia, for Plaintiff; Steven R. Minor, Elliot Lawson & Minor, Bristol, Virginia, for Defendants.*

In this civil fraud case, the jury was improperly subjected to extraneous information prior to its verdict. After an examination of the jurors confirmed the receipt of this information and its circumstances, I find that there is a reasonable possibility that the verdict was influenced by the communication and accordingly, I will grant a new trial.

I

The plaintiff, Xcoal Energy & Resources LP, a coal buyer, sued the defendants Landon Keller Smith and Karl Louis Singer, alleging that they had fraudulently

induced the plaintiff to make advance payments totaling $3.2 million to a coal seller for coal that was never received.[1]

Prior to trial, the plaintiff submitted a Motion in Limine requesting that the court exclude any evidence relating to an unsuccessful claim the plaintiff had made to its insurance carrier for the undelivered coal. The plaintiff was concerned that if the jury learned of its insurance policy, the jury might assume that the plaintiff did not need to recover damages from the defendants. I denied the plaintiff's motion on the ground that it was possible that certain admissions made on behalf of the plaintiff in the process of that claim would be relevant to some of the issues in the case. In denying the motion, I also noted that the mere mention of the plaintiff's insurance policy would not prejudice the plaintiff because the court could then inform jurors that the plaintiff's claim was unsuccessful.

A jury trial commenced on July 22, 2009. That afternoon, outside the jury's presence, defense counsel sought permission to introduce an exhibit referencing the plaintiff's insurance claim for the missing coal. I denied the defendants' request, concluding that the documents in question were irrelevant and unduly prejudicial to the plaintiff.

---

[1] The facts of the claim are more fully discussed in *Xcoal Energy & Resources, LP v. Smith*, No. 2:07CV00057, 2009 WL 1956499 (W.D. Va. July 7, 2009).

On July 23, 2009, the jury returned a verdict for the defendants. The following week, a summer intern who worked for the court was contacted by juror David Hagy. The intern and Hagy had attended high school together. In the process of describing his experience of serving on the jury, Hagy informed the intern that fellow juror Katherine Broadwater had told the jury about the plaintiff's insurance policy. Broadwater learned of the insurance from her husband who had observed the trial's first day.

The day following this contact, on July 29, 2009, I advised counsel of Hagy's statements and Broadwater's alleged disclosure. In response, on July 31, 2009, the plaintiff filed the present Motion for a New Trial.

An evidentiary hearing was held on August 19, 2009, to which all twelve jurors were summonsed. Counsel questioned each juror about the extraneous information introduced by Broadwater. At the conclusion of the hearing, I found that Broadwater's unauthorized communication raised a presumption of prejudice.

The parties have now briefed the issue of whether the defendants successfully rebutted the presumption raised by the unauthorized communication to the jury. This Opinion constitutes the court's findings of fact and conclusions of law.

II

A litigant's constitutional right to an impartial jury is a touchstone of this country's tradition of trial by jury.[2]  Courts have a duty to protect jurors from improper communications and unauthorized contacts in order to properly preserve this right.  Because of this important responsibility, a trial court must investigate any allegation of unauthorized jury communications to determine whether the communication violated a party's right to trial by an impartial jury.  *Herring v. Blankenship*, 662 F. Supp. 557, 564 (W.D. Va. 1987).

Under the Fourth Circuit's decision in *Haley v. Blue Ridge Transfer Co.,* a trial court must adhere to specific investigatory steps when considering allegations of unauthorized jury contacts.  802 F.2d at 1536–37.

First, the court must determine whether juror testimony about the unauthorized disclosure qualifies as competent evidence pursuant to Federal Rule of Evidence 606(b).  *Id.* at 1537.  Under Rule 606(b), jurors may not testify about the deliberation process.  Jurors may testify, however, as to content of the unauthorized communication, when they learned of the extraneous information, and how the information was introduced to the jury.  *Herring*, 662 F. Supp. at 564.

---

[2] The Seventh Amendment's guarantee of the "right to trial by jury" and the Fifth Amendment's due process right form the basis for a civil litigant's right to an impartial jury trial.  *Haley v. Blue Ridge Transfer Co.,* 802 F.2d 1532, 1535 n.4 (4th Cir. 1986).

- 4 -

Then, the court must determine whether the communication was more than an innocuous disclosure "that simply could not justify a presumption of prejudicial effect." *Haley*, 802 F.2d at 1537 n.9. If the communication is not a harmless intervention, the trial court must proceed with the presumption that the unauthorized disclosure prejudiced the losing party. *Id.* at 1536.

After the court invokes a presumption of prejudice, the burden shifts to the prevailing party, which must establish "the lack of 'a reasonable possibility that the jury's verdict was influenced by an improper communication.'" *Stephens v. S. Atl. Canners, Inc.*, 848 F.2d 484, 488 (4th Cir. 1988) (quoting *Haley*, 802 F.2d at 1537). To rebut this heavy burden, the prevailing party must provide evidence that clearly demonstrates that the unauthorized disclosure was harmless. *Herring*, 662 F. Supp. at 564.

When considering the presumption of prejudice, a court may weigh a variety of factors such as "the extent of the improper communication, the extent to which the communication was discussed and considered by the jury, the type of information communicated, the timing of the exposure," and the strength of the prevailing party's case. *United States v. Basham*, 561 F.3d 302, 320 (4th Cir. 2009).

The court's ultimate conclusion will largely depend upon the particular facts of a case and the court may "be compelled to consider the inferences which may be

drawn from the evidence offered to impeach the verdict." *Herring*, 662 F. Supp. at 564.

III

During the August 19, 2009 hearing, jurors offered somewhat conflicting testimony about the extraneous information introduced by Broadwater. I have resolved these conflicts based upon my opportunity to observe the demeanor of the juror-witnesses, taking into account the nature of their testimony, including the extent of its detail and the degree to which it was consistent or inconsistent with other testimony. Following are my findings of fact as to the courtroom discussion about the insurance policy, Broadwater's unauthorized disclosure, and the subsequent discussion by jurors.

During the afternoon of the first day of trial, defense counsel sought the court's permission to cross-examine a witness about an email exchange that referenced the plaintiff's insurance claim for the missing coal. Opposing counsel objected to the use of the email as an exhibit. The plaintiff's attorney alleged that defense counsel wanted to use the exhibit to introduce to the jury the fact that the plaintiff had filed an insurance claim for the coal. The court questioned defense counsel about the email's relevance and the plaintiff's counsel told the court his reasons for objecting

to the email. The court eventually sustained the plaintiff's objection, concluding that the exhibit was irrelevant and unduly prejudicial to the plaintiff.

The jury was absent during this proceeding. But a spectator in the courtroom gallery observed the exchange. That spectator was juror Broadwater's husband, who had driven her to the trial and had stayed in the courtroom to watch the first day's proceedings. That evening, while driving his wife home, Mr. Broadwater told Mrs. Broadwater about the plaintiff's insurance policy and the debate surrounding the exhibit, which they briefly discussed.[3]

The next day, during the trial's second and final day, Broadwater told other jurors, according to her, that "I can tell you this now so you won't feel so guilty, that it's possible that [the plaintiff] had an insurance policy." (Tr. Aug. 19, 2009, at 21.) Broadwater made this statement sometime during deliberations in the court's small jury room before the jury had arrived at a unanimous decision as to its verdict.[4]

---

[3] It is fair to surmise that Mr. Broadwater told his wife more than the mere fact that the plaintiff had insurance. At the evidentiary hearing, Mrs. Broadwater stated, "[M]y husband told me that when you sent us out that you were discussing an insurance policy." (Tr. Aug.19, 2009, at 20–21.) Broadwater further testified that when talking to her husband she repeated what he heard and "[h]e said he didn't quite understand it either. He just said it was possible that XCoal had an insurance policy. And I didn't understand what he was talking about either." (*Id.* at 23.)

[4] Broadwater testified that jurors had already agreed upon a verdict when she uttered the unauthorized information, although the verdict had not been announced. Testimony from five of the nine jurors who recalled the exchange contradicts Broadwater. These five jurors stated that Broadwater made the statement before the jury reached a verdict. Four other

- 7 -

The jurors who recalled hearing the improper information agreed that Broadwater's utterance was brief. But jurors offered varied recollections of the exact substance of Broadwater's statements. Several jurors said Broadwater had said her husband was in the courtroom during the trial's first day and that he had told her about the plaintiff's insurance coverage. One juror, however, testified that the topic of insurance arose when the jury hypothesized whether the plaintiff had insurance and, if so, whether the insurance compensated the plaintiff for the coal. In comparison, at least two jurors recalled Broadwater stating that the plaintiff's insurance had reimbursed the plaintiff for the missing coal.

The nine jurors who remembered the improper disclosure agreed that Broadwater did not discuss the email exhibits shown to the court, the plaintiff's reasons for objecting to the documents, or the court's ruling on the exhibit. These jurors also stated that a brief jury discussion followed Broadwater's statement.

Regardless of the varying recollections by the jurors, I find that prior to agreement as to the verdict, Mrs. Broadwater told other jurors substantially as she testified to, namely, that they did not need to feel guilty about denying the plaintiff

---

jurors who recalled the unauthorized disclosure could not remember when they heard the information. The jury began deliberations at 5:15 p.m. Jurors were served dinner in the jury room at some point that evening. Several jurors testified that the jury took its second and final vote shortly after finishing dinner. The jury returned its verdict at 8:38 p.m.

their verdict, because her husband had learned that the plaintiff had insurance that may have covered its loss.

IV

At the August 19, 2009 hearing, I concluded that under Rule 606(b), the jurors had offered competent testimony and that the plaintiff was presumptively prejudiced by Broadwater's disclosure. These findings now lead the court to its third consideration—do the facts clearly demonstrate that the communication was harmless? Or, is there still a reasonable possibility that the improper communication influenced the jury's verdict?

To determine this, the court's "principal chore" is to "determine if the presumption raised by" the jury's testimony "is rebutted by the inferences flowing from them." *Haley*, 802 F.2d at 1537.

My first consideration is to evaluate when Broadwater disclosed the improper information to the jury. With this consideration it is important to note not only the timing of Broadwater's statement, but also the reasonable inferences that can be drawn about why Broadwater made the statement when she did.

Although the exact timing of Broadwater's statement is uncertain, I find that she disclosed the prejudicial information during deliberations but before the jury

- 9 -

reached agreement as to whether the defendants had defrauded the plaintiff. This leads to a logical conclusion that the timing of the statement harmed the plaintiff.

I must also consider the type of information communicated. Broadwater told jurors that her husband learned about the insurance policy after the court had excused the jury from the courtroom. Broadwater made a direct communication to the jury of information that the jury was clearly not supposed to hear. Further, Broadwater's out-of-court statements prejudiced the plaintiff because the court could not offer limiting instructions to lessen any possible harm.

Broadwater's disclosure was a second-hand statement containing incomplete knowledge. This statement prejudiced the plaintiff because it supplied jurors with only a portion of the facts. If the issue of the plaintiff's insurance had arisen during trial, the court would have presented the entire picture to jurors by instructing the jury that the plaintiff's insurance claim was unsuccessful. Here, the content of Broadwater's disclosure created the exact scenario the plaintiff sought to avoid. Jurors learned about the insurance policy, but they had no idea that the plaintiff's insurance claim had been unsuccessful.

The content of Broadwater's statement also harmed the plaintiff because of the subject matter involved—a party's insurance coverage. Typically in tort litigation, a defendant is harmed by knowledge or speculation about insurance coverage, since

the jury may think that the insurance company, and not the individual defendant, will pay any damages awarded. To prevent juries from considering this prejudicial information, courts generally prohibit the admission of evidence merely used to inform the jury that the defendant has insurance coverage. For example, Virginia's Supreme Court has strictly enforced its rule that intentional comments about a defendant's insurance coverage, "made to inform the jury that a defendant is insured against the accident constitutes reversible error." *Speet v. Bacaj*, 377 S.E.2d 397, 399 (Va. 1989); *see also Hope Windows, Inc. v. Snyder*, 158 S.E.2d 722, 725 (Va. 1968).

In this case, it is the plaintiff, not the defendant, who carried insurance. But the principal reason for curtailing the intentional comments about insurance is the same as in other tort cases—insurance is irrelevant to the question of liability and the jury's consideration of insurance could improperly influence the jury's ultimate conclusion. Here, the jury learned that the plaintiff had insurance and, even worse, several jurors incorrectly thought that the insurance company had reimbursed the plaintiff's for the damages suffered. It is reasonable to assume that the disclosure about plaintiff's insurance coverage improperly colored the jury's deliberations and may have led some jurors to think the plaintiff did not need to collect monetary damages.

Broadwater's statement and the jury's discussion about insurance were brief, and it is argued that this rebuts the assertion that the extraneous information

prejudiced the plaintiff. But the prejudicial effect of the disclosure was magnified because this is a close case. The jury was presented with starkly conflicting evidence concerning the alleged fraud. Accordingly, the improper information concerning insurance, no matter how brief, may very well have tipped the balance, at least for some of the jurors.

Considering Broadwater's statements about the plaintiff's insurance in the context of the case and the jury's verdict in favor of the defendants, it becomes clear that there remains "'a reasonable possibility that the jury's verdict was influenced by the material that improperly came before it.'" *Haley*, 802 F.2d at 1538 (quoting *United States v. Barnes*, 747 F.2d 246, 250 (4th Cir. 1984)).

The testimony about Broadwater's communication does not clearly indicate that the unauthorized information was harmless to the plaintiff. I find that Broadwater's disclosure raises a logical inference that the extraneous information improperly colored the jury's deliberations and decision. Because of this, it is unlikely that the plaintiff received a fair trial by an impartial jury.

- 12 -

V

For the foregoing reasons, it is **ORDERED** that the plaintiff's Motion for a New Trial is GRANTED. The clerk is directed to schedule another jury trial at the earliest available date.

        ENTER: October 26, 2009

        /s/ JAMES P. JONES
        Chief United States District Judge